98 N.J. Super. 451 (1968)
237 A.2d 640
THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF BURLINGTON, ET AL, PLAINTIFFS,
v.
LLOYD W. McCORKLE, COMMISSIONER OF THE DEPARTMENT OF INSTITUTIONS AND AGENCIES OF THE STATE OF NEW JERSEY, ET AL, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 5, 1968.
*453 Mr. Sanford Soren, County Solicitor, attorney for plaintiffs (Mr. Richard D. Ehrlich appearing).
Mr. Arthur J. Sills, Attorney General of State of New Jersey, attorney for defendants (Mr. Eugene T. Urbaniak appearing).
MARTINO, A.J.S.C.
The parties to this litigation have agreed upon the facts and have filed with the court a stipulation of those facts.
*454 The basic legal questions deal with the application of certain New Jersey laws to inhabitants of Fort Dix and McGuire Air Force Base, two federal military bases located within the boundaries of Burlington County.
Two distinct factual patterns are involved. The first relates to children, born to inhabitants of the bases, who become dependent and require the care or guardianship of the New Jersey Bureau of Children's Services. The second concerns base inhabitants who become mentally ill and require admission to a State Hospital for care and treatment.
Plaintiffs seek a declaratory judgment against the defendants, while the latter counterclaim for a declaratory judgment against the plaintiffs.
Plaintiffs contend that L. 1938, c. 354, ceded jurisdiction to the United States over lands theretofore acquired by it for military purposes in Burlington County and concurrent jurisdiction was reserved by the State only for the execution of civil and criminal process. Additionally, N.J.S.A. 52:30-1 and 52:30-2, incorporating the provision of the general cession act of March 29, 1907 (L. 1907, c. 19) cede exclusive jurisdiction to any land acquired by the United States, for certain enumerated purposes, the State retaining concurrent jurisdiction only for the service of process in civil and criminal proceedings.
Plaintiffs further contend that these acts preclude a County Court from committing any inhabitant of the two federal bases to a state hospital and preclude the county adjuster from processing applications for such commitments.
Defendants, however, contend that N.J.S.A. 30:4-27 to 31 permit the county court to commit any person believed to be mentally ill to a state hospital, whether a resident or non-resident, and notwithstanding the person may be an inhabitant of one of the military bases; that said base residents are entitled to care in a state hospital, and that the county adjuster is not precluded by any law from processing such applications for their commitment.
*455 The United States of America has filed an amicus curiae brief with the court in which it joins with these defendants in contending that the inhabitants of the federal bases are entitled to the services involved.
Plaintiffs contend that the Federal Government has created the problems which exist with respect to the welfare of residents of federal enclaves, and by shunning its responsibilities the Federal Government seeks to place the burden upon the taxpayers of adjoining sovereignties.
Plaintiffs further contend that no federal legislation has been enacted to attend to the needs of children resident upon federal territory, and the only pertinent welfare legislation in effect is a provision of the Social Security Act (42 U.S.C.A. § 721) which requires the several states to participate in child welfare programs in order to receive benefits from the Federal Government. Plaintiffs feel that the absence of legislation does not mean that the Federal Government should be permitted to cast upon the states a portion of its responsibilities with respect to needy children and the mentally ill resident upon federal territory.
Plaintiffs make the further argument that because some states have accepted the authority to oversee the welfare of inhabitants of a federal enclave does not mean that the responsibility thereof rests with the states, and if the states failed to cooperate it is extremely likely that the Federal Government would then assume its responsibility by means of enactment of necessary legislation.
The New Jersey Bureau of Children's Services is the state agency required to provide care, custody, guardianship, maintenance and protection of children, and welfare services, or maintenance, or both, for dependent and neglected children under N.J.S.A. 30:4C-1 et seq.
Whenever the Bureau receives an application on behalf of any child "within this State," pursuant to N.J.S.A. 30:4C-11, setting forth that the child is of such circumstances that his welfare will be endangered unless proper care and custody is provided, it may, following verification of the facts of the *456 application, accept and provide such care and custody as the circumstances of the child may require.
Pursuant to N.J.S.A. 30:4C-15, if, after the Bureau accepts a child into its care and custody, it appears that the best interest of the child requires that he be placed under guardianship, the Bureau may file a petition for guardianship with the Juvenile and Domestic Relations Court of the county "where such child may be at the time of filing of such petition." Upon completion of the hearing in such action, if the court is satisfied that the best interests of the child require that he be placed under guardianship, the court, pursuant to N.J.S.A. 30:4C-20, shall make an order committing the child to the guardianship and control of the Bureau.
Pursuant to N.J.S.A. 30:4C-30, the cost of maintenance provided for any child under the provisions of N.J.S.A. 30:4C-1 et seq. "shall be shared equally by the State and by that county where such child may be or may have been at the time of the filing of an application seeking care or custody, or at the time of the filing of a petition seeking guardianship," and payments from county funds for the county share shall be made monthly by the county treasurer to the Bureau on the basis of commitments for such county upon bills furnished by the Bureau.
While plaintiffs do not deny the existence of these statutes, they contend, however, that these provisions do not apply to children who live at Fort Dix or McGuire Air Force Base, the two military bases located in Burlington County. They contend that N.J.S.A. 52:30-2 or, in the alternative, L. 1938, c. 354, precludes the court from invoking its jurisdiction over any infants living at the military bases, and also supersedes N.J.S.A. 30:4C-30, with the result that Burlington County cannot be held liable for its share of the care and maintenance of such children.
The State of New Jersey receives federal monies under 42 U.S.C.A. § 726, to spend for research, training, or demonstration projects in the field of child welfare. The State also *457 receives federal monies under 42 U.S.C.A., § 727, for day care services for children whose parents are absent from home or unable, for other reasons, to provide parental supervision. It should be noted that under 42 U.S.C.A., § 723(b) (2), the payments to a state for the above purposes will only be made if it shows it is extending child welfare services in the state with a view to making child welfare services available for "all children in need thereof."
N.J.S.A. 52:30-2 provides:
"Exclusive jurisdiction in and over any lands so acquired by the United States is hereby ceded to the United States for all purposes except the service of process issued out of any of the Courts of this State in any civil or criminal proceeding."
By the special cession act of June 14, 1938 (L. 1938, c. 354) the State of New Jersey ceded to the United States of America lands in Burlington and Ocean Counties known as Camp Dix. The act reserved to the State concurrent jurisdiction with the United States over said lands for the execution of civil and criminal process and exonerated said lands from all taxes, assessments and other charges levied or imposed under the authority of the State.
Pursuant to the general cession act of March 29, 1907 (L. 1907, c. 19, §§ 1 through 3) the United States of America acquired McGuire Air Force Base. See N.J.S.A. 52:30-1 et seq.
The central thrust of plaintiffs' argument is that the State of New Jersey, by ceding the above lands, ceded "exclusive jurisdiction" to the Federal Government in "all" matters and hence is without authority to administer welfare relief to residents of said military reservations.
Considering the counts of the complaint in reverse order, we must first look at N.J.S.A. 30:4-27, which provides in part:
"A person believed to be mentally ill may be admitted to and hospitalized in any mental hospital in this State in an action brought *458 by a person interested in the admission of the patient by reason of relationship or marriage, * * *"
It is undisputed that in each instance alleged in the case at bar the application for commitment was made by a blood relative or a relative by marriage.
N.J.S.A. 30:4-31 provides:
"A non-resident of this State may be committed to a mental hospital in this State in the same manner as residents may be admitted and committed."
And N.J.S.A. 30:4-57 provides:
"If the patient shall be found to be mentally ill and to have no legal settlement in any county in this State, the Court may commit him to a mental hospital owned by the State."
A reading of the above statutes clearly indicates that insofar as the commitment of a mentally ill person is concerned, residence is of no significance. Certainly, any person living on a United States military base located within Burlington County is either a resident of New Jersey or a non-resident. In any event, he may be committed to a mental hospital under the above statutes. The wording of the statutes is plain and clear and their meaning obvious.
The New Jersey statutory scheme concerning mentally ill persons is consistent with cases in other jurisdictions which have held that the state's power over the mentally ill derives from the necessity of assisting and protecting such individuals and the community, and is, therefore, not confined to persons who are residents of the State.
In the case of Bliss v. Bliss, 133 Md. 61, 104 A. 467 (Ct. App. 1918), the court enunciated this policy:
"* * * the jurisdiction of courts of equity to issue writs de lunatico inquierendo is exercised for the protection of the community, and the protection of the person and property of the alleged lunatic, there is no reason why it should be confined to cases in which the unfortunate persons are residents of or have property in *459 the state. It is their presence within the limits of the state that necessitates the exercise of the power to protect their persons and the community in which they may be placed * * *" (104 A., at p. 471)
Finally, it should be noted that New Jersey enacted the Interstate Compact on Mental Health in 1956. Pursuant to this act, N.J.S.A. 30:7B-1 et seq., an expeditious method is established for the treatment of the mentally ill and their interstate transfer. N.J.S.A. 30:7B-3 provides:
"(a) Whenever a person physically present in any party State shall be in need of institutionalization by reason of mental illness or mental deficiency, he shall be eligible for care and treatment in an institution in that State irrespective of his residence, settlement or citizenship qualifications." (Emphasis added.)
The tenor of the law as it exists in this State definitely illustrates that mentally ill and mentally deficient persons located in New Jersey shall receive necessary care and treatment regardless of their residence or citizenship.
The question which disturbs plaintiffs and which requires a determination is whether the cession of the land in question created "exclusive jurisdiction" within the federal enclave so as to preclude inhabitants therein from benefiting from state welfare legislation.
It should be noted that the United States Government is not raising the question of the invasion of its sovereignty. The Government by its amicus curiae brief denies the invasion.
Plaintiffs are enveloping themselves with the federal mantle and arguing that to pay the claimants the relief money would constitute an invasion of federal sovereignty. See Board of Com'rs of County of Arapahoe v. Donohoe, 144 Colo. 321, 356 P.2d 267 (Colo. Sup. Ct. 1960) where the court commented on a similar position taken by an appellant and held that a civilian resident of a federal enclave was entitled to be a recipient of relief benefits, and in referring to exclusive jurisdiction said:
*460 "`Exclusive legislative' jurisdiction does not operate as an absolute prohibition against state laws but has for its purpose protection of federal sovereignty, we conclude that it does not operate to prohibit the payment of relief to a resident of [a military enclave]. The conferring of a benefit required by federal law cannot be construed as an act which undermines the federal sovereignty. Indeed, by paying relief in these circumstances, the federal policy to recognize citizens of the United States is fostered and promoted."
It should be repeated at this point that plaintiffs admit that no federal legislation has been enacted to attend the needs of residents of federal enclaves who fit the category for which our state statutes have made provision, so that such persons would be without benefit of any law for their relief. A comparable situation arose in In Re Kernan, 247 App. Div. 664, 665, 288 N.Y.S. 329 (App. Div. 1936), affirmed 272 N.Y. 560, 4 N.E.2d 737 (Ct. App. 1936), where a mother sought custody of her daughter who was held by respondent father in a federal military enclave where he was an Army officer. The court pointed out that there was an absence of authority for a federal court to grant a writ of habeas corpus to determine the custody of the child and that it followed that since jurisdiction to grant relief rested in the first place in the courts of the ceding state (New York) within which the child whose custody was sought was found, it should remain there.
It appears to be settled law that the cession or purchase of territory does not create an absolute exclusive sovereignty within the federal enclave  as contradictory as the term may appear.
The modern view is that the term "exclusive" as used in U.S. Const., Art. I, Sec. 8, cl. 17, relates to protection of the Federal Government against conflicting regulations. See Penn Dairies v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943); Pacific Coast Dairy v. Department of Agriculture, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1943); James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937).
*461 The fact that the United States acquires exclusive jurisdiction over property purchased with the consent of a state does not necessarily divest the state of all power with respect to it; on the contrary, so long as it in no way interferes with the jurisdiction asserted by the Federal Government, the state may continue to exercise its power. 91 C.J.S. United States § 7.
It seems that state laws passed for the public welfare should be applied to federal enclaves within the state, for the state is best fitted to know the requirements of its particular locality and to deal with them. Such measures, it appears, would not interfere with the function of the Federal Government. See 12 Geo. Wash. L. Rev. 80, at p. 92.
The desirability of permitting the state to retain jurisdiction for local purposes involving no interference with performance of governmental duties is becoming more and more evident as the activities of the Federal Government expand; the United States should not be compelled to exercise exclusive jurisdiction over all property it acquires. James v. Dravo Contracting Co., supra.
Finally, it should be mentioned that the public policies of this State as expressed in N.J.S.A. 30:4C-1, are illuminative. That statute declares the public policy of New Jersey to be:

"* * * * * * *
(d) that wherever in this State necessary welfare services are not available to children who are dependent or adjudged delinquent by proper judicial tribunal, or in danger of so becoming, then such services should be provided by this State until such time as they are made available by private and voluntary agencies." (Emphasis added.)
Plaintiffs also contend that under the doctrine of James Stewart and Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596 (1939), only those state laws which were in effect at the date of the cession continue in effect after the cession. More specifically, the contention is that the legislation regarding *462 the Bureau of Children's Services (N.J.S.A. 30:4C-1 et seq.) and the legislation regarding commitment of mentally ill persons (N.J.S.A. 30:4-23 et seq.) were enacted after the cession of land to the United States for McGuire Air Force Base and Fort Dix. That argument is unpersuasive. New Jersey has a history replete with examples showing a concern for neglected and dependent children as well as for mentally ill individuals. The concept of relief or welfare is not new in New Jersey. In 1899 the New Jersey Legislature created a State Board of Children's Guardians (L. 1899, c. 165), although other legislation concerning the welfare and safety of children had been enacted even before that. See L. 1879, c. 122; L. 1881, c. 196. The responsibility and authority of the Board was periodically enlarged, see L. 1902, c. 160, and L. 1910, c. 13, until 1951 when the Legislature created the "Bureau of Children's Services."
According to N.J.S.A. 30:4C-2 (L. 1951, c. 138, § 2) the Bureau of Children's Services:
"Means the State agency for the care, custody, guardianship, maintenance and protection of children * * * and succeeding the agency heretofore variously designated by the laws of this State as the State Board of Child Welfare or the State Board of Children's Guardians."
A 1962 amendment to the act, N.J.S.A. 30:4C-2.1, provided:
"Except as otherwise provided by this act, the Bureau of Children's Services shall in all respects and for all purposes be deemed a continuation of the agency heretofore known as the State Board of Children's Guardians * * *" (L. 1962, c. 197, § 39; emphasis added)
For a comprehensive analysis of the development of relief and welfare activity in New Jersey, see Leiby Charity and Correction in New Jersey (Rutgers Univ. Press 1967). Also see L. 1926, c. 51; L. 1928, c. 105; L. 1918, c. 147; L. 1919, c. 97.
*463 The same traditional concern was shown by the New Jersey State Legislature for the mentally ill. See L. 1901, c. 186; also L. 1906, c. 323, and L. 1918, c. 147, pp. 372-425.
For the reasons stated, the court finds no basis for the relief sought by plaintiffs and the complaint is dismissed. Judgment for the defendants on the counterclaim will be entered; no costs.